UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| SAMANTHA ZUCKERMAN, ) | |
| *a minor, by her parent and natural* ) | |
| *guardian, Roberta Zuckerman*, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 08-cv-335-B-W |
| ) | |
| CAMP LAUREL, ) | |
| ) | |
| Defendant ) | |

**RECOMMENDED DECISION ON MOTION FOR SUMMARY JUDGMENT**

Samantha Zuckerman fell off a cantering pony while participating in equestrian lessons at Camp Laurel. In this action, through her parent and natural guardian, Samantha pursues a negligence claim against Coastal Camps Inc., doing business as Camp Laurel. Camp Laurel has filed a motion for summary judgment (Doc. No. 26), contending that it is entitled to immunity under Maine's Equine Activities Statute, 7 M.R.S. §§ 4101 & 4103-A. The Court referred the motion for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For reasons that follow, I recommend that the Court deny the motion.

**FACTS**

The following factual statement is drawn from the parties' statements of material fact submitted and construed in accordance with District of Maine Local Rule 56. The relevant documents are the Defendant's Statement of Undisputed Facts (Doc. No. 26-1), the Plaintiff's Opposition to Defendant's Statement (Doc. No. 31), the Plaintiff's Statement of Additional

Material Facts (Doc. No. 33), and the Defendant's Reply Statement of Material Facts (Doc. No. 37).

Camp Laurel is a corporation[1] organized under the laws of the State of Maine. Camp Laurel operates a summer camp for children in Mount Vernon, Maine. (Def.'s Statement ¶ 1.) Samantha Zuckerman attended Camp Laurel during the summers of 2003, 2004, 2005, and 2006. (Id. ¶ 2.) As part of its program, Camp Laurel offers parents the option of enrolling their children in horseback riding lessons. To select this option, parents check a box on the Camp's enrollment form. (Id. ¶ 3.) Roberta Zuckerman, Samantha's mother, read, signed, and assented to the terms and conditions set forth on Camp Laurel's enrollment forms each year she sent Samantha to Camp Laurel. (Id. ¶ 4.) Samantha did not enroll in riding lessons during the summers of 2003 or 2004, but she did ride in 2005 and 2006 (her final two summers at Camp Laurel). (Id. ¶ 5.)

Pamela Payson has been the head of Camp Laurel's equestrian program since 2006. Payson is an experienced horsewoman and riding instructor, as well as the mother of five children. (Id. ¶ 6.) As the head of the program, Ms. Payson trains and supervises the staff, regulates safety standards, and chooses the horses that will be used in the program. (Pl.'s Add'l Statement ¶ 1.)

Sarah Balmer was one of Camp Laurel's riding counselors/instructors during the summer of 2006. Ms. Balmer is a trained rider who had limited experience training others prior to her involvement with Camp Laurel's equestrian program. (Def.'s Statement ¶ 8.) Ms. Balmer was

---

[1] The parties agree on this characterization of Camp Laurel, although the current docket reflects that Coastal Camps Inc. is the defendant and does business under the name Camp Laurel.

Samantha's instructor during the entire summer of 2006, including on the day of the incident. (Id. ¶ 9.)

Samantha's equestrian training began at Camp Laurel in the summer of 2005 and she took lessons in New York between the summer of 2005 and the summer of 2006. In that time Samantha learned how to saddle a horse and how to check to see that the saddle was secure. (Id. ¶ 11; Pl.'s Opposition ¶ 11; Dep. of Samantha Zuckerman at 12-13, Doc. No. 26-4.)

When the incident occurred, Samantha was learning to canter on a pony named Tinkerbell. (Def.'s Statement ¶¶ 12, 15.) Samantha had assisted with tacking and saddling Tinkerbell throughout the summer. (Id. ¶ 13.) Ms. Balmer was leading Tinkerbell around the ring on a "lunge line" and Samantha fell from the horse. (Id. ¶¶ 14-15.) Ms. Payson and Ms. Balmer were present and witnessed the event. (Id. ¶ 16.) Ms. Balmer took Tinkerbell out of the ring almost immediately after the fall and Ms. Payson attended to Samantha who remained on the ground. (Id. ¶ 17; Pl.'s Add'l Statement ¶ 43.)

During the cantering lesson Tinkerbell was wearing a "grazing check," a piece of tack used to prevent a horse from pulling its head forward to eat while a rider is on the horse. (Def.'s Statement ¶¶ 23-24.) Depending on the degree of movement in the saddle, a grazing check can cause a horse's head to be jerked around when the saddle slips. (Id. ¶ 25.) Grazing checks do not keep a saddle from sliding from side to side or even from "going really far over." (Pl.'s Add'l Statement ¶ 33.)

Samantha participated in the tacking and saddling of Tinkerbell, but Ms. Balmer checked the cinch prior to Samantha riding Tinkerbell. (Def.'s Statement ¶ 27; Pl.'s Opposition ¶ 17; Zuckerman Dep. at 35-36.)

Camp Laurel used fleece-lined girths on the horses used for riding instruction in 2006 because the tack acquired by the Camp at the beginning of the season came with girths that Ms. Payson was not fond of.  (Pl.'s Additional Statement ¶ 5.)  With Tinkerbell and certain other horses or ponies, Ms. Payson also employed a piece of tack known as a crupper, which is used to keep a saddle from sliding forward (though not from side to side).  (Id. ¶ 7.)  A crupper consists of a tether that runs from the saddle, down the horse's back to a rolled leather loop that goes under the top of the horse's tail.  (Id. ¶ 8.)  Cruppers are most commonly used on ponies.  When a saddle is placed on a pony with low withers and a round belly, the saddle will sometimes shift forward.  Cruppers help to prevent this saddle movement.  (Id. ¶ 9.)  Ms. Payson testified that she decided to use a crupper with Tinkerbell because "Tinkerbell had low withers, and I just wanted her saddle not to ride forward at all."  (Id. ¶ 10;  Pl.'s Add'l Statement ¶ 30.)  Ms. Balmer testified that the decision was made to use a crupper on Tinkerbell because her saddle had been sliding forward, due to Tinkerbell's round (or "fat") belly.  (Def.'s Statement ¶ 12;  Pl.'s Add'l Statement ¶ 29.)

Ms. Payson testified at her deposition concerning camp protocol associated with pre-lesson tacking.  She explained that at the beginning of a lesson, the rider and the riding instructor put the tack on the horse together.  In her words:  "When you're tacking up a horse, when you first put the saddle on, you put the girth on snug enough so your saddle is not going to shift, but not—you don't tighten it up all the way."  (Pl.'s Add'l Statement ¶ 18.)  Following the initial saddling of the horse in the stable, the horse is led down and into the instruction ring.  At this point, the instructor tightens the girth, possibly fully.  (Id. ¶ 19;  Dep. of Pamela Payson at 86-87, Doc. No. 32-2.)  Thereafter, the rider mounts the horse using a mounting block.  Once the rider is on the horse, the instructor is supposed to check the girth a third time.  "When someone mounts,

you always check the girth again because sometimes depending on what you have for pads on the horse or whatever . . . . [w]hen you sit down . . . sometimes you end up with a little play, so you always check that." (Pl.'s Add'l Statement ¶ 20; Payson Dep. at 88-89.) According to Ms. Payson, she never deviates from this protocol. (Def.'s Reply Statement ¶ 17.)

In its interrogatory answers, Camp Laurel indicated that "Tinkerbell's saddle was properly cinched, having been checked twice before Samantha Zuckerman mounted him for her riding lesson . . . ." (Pl.'s Add'l Statement ¶ 22.) In her deposition testimony, Ms. Balmer stated that she would always check the girth twice prior to a student mounting, having the rider participate in this process, and that she would sometimes check the girth a third time after mounting. (Id. ¶ 23; Dep. of Sarah Balmer at 49 & 52-53, Doc. No. 32-3.) For her part, Samantha testified that, as a general matter in 2006, she only recalls the Camp Laurel riding instructors checking the girth twice before the horse or pony was mounted. (Pl.'s Add'l Statement ¶ 27.)

Samantha described her fall from Tinkerbell as follows: "I was cantering in a circle on a lead rope . . . and I started to feel the saddle slide towards the left, and I lost my balance; and my foot somehow . . . got caught in the stirrup, but when I hit the ground I—I mean, my foot came out of the stirrup, and I hit my head while falling." (Id. ¶ 34; Zuckerman Dep. at 24-25.)

Among Camp Laurel's initial disclosures are notes from Jeremy "Jem" Sollinger, one of the directors of the Camp. Among these notes is one of a conversation between Sollinger and Pam Payson on September 11, 2006. According to these notes, Pam told Jem that Samantha "injured her knee because she 'hooked her foot on the saddle and torked [*sic*] her leg. . . . The saddle had safety stirrups and she did not get hung up in the stirrups at all . . . She lost her

5

balance.'"  (Pl.'s Add'l Statement ¶ 35;  Camp Laurel's Initial Disclosures, Doc. No. 32-6 at CL-0059.)  Later, at her deposition, Ms. Payson testified that Samantha's feet hit the ground first and that she did not hook her foot in the saddle.  (Pl.'s Add'l Statement ¶¶ 36-37.)  Both Ms. Payson and Ms. Balmer testified that they observed the fall and that Samantha simply fell because she lost her balance.  (Id. ¶¶ 39-41.)

Samantha testified that a couple of seconds after she fell she looked up and saw the saddle "on the side or underneath" Tinkerbell.  (Id. ¶ 38; Zuckerman Dep. at 25-26, 28.)  In contrast, Ms. Payson testified that the saddle would have to have "shifted slightly" in the fall but was not over the side of or underneath Tinkerbell after the fall.  (Pl.'s Add'l Statement ¶ 42; Payson Dep. at 95.)

Among the contested statements in this case are a series of statements supported by citations to a declaration submitted by Plaintiff's expert witness, Ida Anderson.[2]  Ms. Anderson declares that fleece-lined girths are more prone to slippage and that use of such a girth "may have allowed the saddle to slip."  (Pl.'s Add'l Statement ¶ 6.)  Camp Laurel denies this statement and argues that it is not a proper factual statement to state that the fleece-lined girth "may have allowed" the saddle to slip.  Camp Laurel does not otherwise deny that fleece-lined girths are more prone to slippage.  I interpret this statement as an expert explanation of one contributing factor that would support a finding that the saddle did, in fact, slip as Samantha testifies it did.  I treat this as a material factual statement and consider it as fair testimony that may be considered on behalf of a summary judgment non-movant who is entitled to have the record reviewed in the light most favorable to her case.

---

[2] Ms. Anderson's qualifications to serve as an expert witness have not been challenged.  Nor has her testimony been challenged as unreliable pursuant to Federal Rule of Evidence 702.  There is no Daubert motion on the docket.

6

Ms. Anderson also declares that Tinkerbell's saddle could have slipped forward onto the withers despite the use of the crupper due to Tinkerbell's round belly and low withers. (Id. ¶ 14.) Camp Laurel denies this statement as speculative and complains that a saddle slipping forward is a different issue than slipping sideways. I find this contest to be like the prior contest. The point of Ms. Anderson's testimony is that the crupper is not a certain cure to a slipping saddle. Additionally, it is apparent from reviewing the various statements and the cited portions of the record that once a saddle slips forward there will be less tension in the girth, at least with a rotund pony. This leads to the next contested statement by Ms. Anderson, to the effect that "[o]nce a saddle slips forward and it no longer cups the withers, it is nearly inevitable that it will slip sideways." (Id. ¶ 15.) Once again, for purposes of summary judgment, Samantha, as non-movant, is entitled to the benefit of this expert testimony.

Ms. Anderson also declares that Ms. Balmer breached a standard of care if she failed to check and tighten the girth after Samantha had mounted Tinkerbell. (Id. ¶ 21.) Camp Laurel denies the statement on the ground that it is a statement of opinion by an expert witness. That objection is insufficient to preclude consideration of such testimony and, moreover, the opinion gains support from Ms. Payson's testimony concerning Camp Laurel's tack protocol. As for whether or not Ms. Balmer conformed to this protocol prior to the incident, a fact finder could credit Samantha's testimony and conclude that Ms. Balmer did not cinch down the girth after Samantha mounted.

Finally, Ms. Anderson declares: "If Tinkerbell's saddle slipped . . . this is most likely due to Ms. Balmer's negligence in failing to properly tighten the girth on the saddle . . . ." (Id. ¶ 49.) Camp Laurel's objection is to the same effect, as is my assessment of the objection. This is garden-variety expert testimony.

There remains one additional disputed issue. Plaintiff offers statements to the effect that the tack Camp Laurel used on Tinkerbell was of poor quality. (Id. ¶¶ 3-4.) Camp Laurel anticipated such statements and offered its own statements to the contrary. (Def.'s Statement ¶¶ 19-20.) The origin of this dispute is in deposition testimony given by Ms. Payson and Ms. Balmer, who described Tinkerbell's tack as being on par with a Ford Escort as compared to a Lamborghini, or as a 4 on a scale of 1-10. (Pl.'s Add'l Statement ¶¶ 3-4; Balmer Dep. at 17-19; Payson Dep. at 103-104, 124-25.) The testimony is certainly relevant, but I am not impressed that it is material in the sense of being potentially determinative of the summary judgment issue. I note that, other than criticizing the use of a fleece-lined girth, Ms. Anderson has not asserted in her declaration that the tack was of poor quality simply because it was not the most expensive and comfortable tack on the market.

## DISCUSSION

A party moving for summary judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. Merch. Ins. Co. v. U. S. Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998). If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

The First Amended Complaint (Doc. No. 16) asserts a solitary negligence claim against Coastal Camps, Inc., doing business as Camp Laurel.  Duty, breach and causation are set forth as follows:

> 19.  Defendant had a duty to ensure that its riding instruction program conformed to reasonable safety standards in the horse riding industry, and a duty to otherwise ensure that its riding program was conducted in a manner that reasonably ensured Ms. Zuckerman's safety.
>
> 20.  Defendant breached its duty of care to Ms. Zuckerman by failing to ensure that Tinkerbell was properly saddled for Ms. Zuckerman's riding lesson and by otherwise failing to ensure that its riding program was conducted in a manner that reasonably ensured Ms. Zuckerman's safety, and it was foreseeable that as a result of this breach, Ms. Zuckerman would suffer damages.
>
> 21.  As a result of Camp Laurel's breach of its duty of care, Ms. Zuckerman has suffered damages, including a limited concussion, lower back pain, a torn anterior cruciate ligament and injury to her patella tendon.

Camp Laurel seeks summary judgment against this claim on two grounds.  First, it argues that Maine's Equine Activities Statute bars the action because Samantha's alleged injuries can only be understood as arising from risks inherent in equine activities.  (Mot. for Summary J. at 6-11.)  Second, it argues that Samantha's testimony is not sufficient to permit the finder of fact to find that the saddle did slip and roll to the side of Tinkerbell during Samantha's cantering lesson.  (Id. at 11-13.)  I address the latter argument first.

**A.      Sliding Saddle**

According to Camp Laurel, the testimony of Ms. Payson and Ms. Balmer is decisive on the issue of whether the saddle significantly slid to the side of Tinkerbell because Ms. Balmer almost immediately removed Tinkerbell from the ring and Samantha hit the ground hard and believes she may have lost consciousness momentarily (because she does not recollect hitting the ground).  Given these circumstances, Camp Laurel argues that Samantha's testimony that she

observed the saddle on the side of or underneath Tinkerbell cannot be credited as trustworthy as a matter of law. Camp Laurel seeks to buttress this conclusion based on Ms. Payson and Ms. Balmer's collective recollection that Tinkerbell's head was not pulled to the side by the grazing check, which would have occurred had the saddle rolled significantly during the incident. They also argue that the facts demonstrate that the saddle was cinched "at least twice" by Balmer, and probably three times. (Id. at 14-15.) The argument that the finder of fact could not believe Samantha is unavailing. Her deposition testimony is to the effect that she saw the saddle to the side of or underneath ("closer to underneath"), and that she believes what she saw. (Zuckerman Dep. at 25-26, 28.) These arguments all go to weight and, for purposes of summary judgment, Samantha is entitled to have her testimony concerning her first-hand observations credited in her favor. To the extent that Camp Laurel argues the finder of fact could not reasonably find that Ms. Balmer failed to check or cinch the saddle after Samantha mounted, the appropriate assessment is to the same effect. Samantha testified that the instructors did not ordinarily check or tighten the girth after she mounted and Camp Laurel's sworn interrogatory answers were to the effect that the saddle was cinched twice before Samantha mounted, without indicating that there was any adjustment thereafter.

**B.     Inherent Risk?**

Camp Laurel's primary challenge to the negligence claim rests on the Maine Equine Activities Statute, which consists of two related provisions. For ease of reference, these provisions are set out here, in large part and in reverse order:

**§ 4103-A. Liability for equine activities**

  1. LIABILITY. Except as provided in subsection 2, an equine activity sponsor, an equine professional or any other person engaged in an equine activity is not liable for any property damage or damages arising from the personal injury or death of a participant or spectator resulting from the inherent risks of equine activities.  Except as provided in subsection 2, a person may not make any claim or recover from any person for any property damage or damages for personal injury or death resulting from the inherent risks of equine activities.  Each participant and spectator in an equine activity expressly assumes the risk and legal responsibility for any property damage or damages arising from personal injury or death that results from the inherent risk of equine activities.  Each participant has the sole responsibility for knowing the range of that person's ability to manage, care for and control a particular equine or perform a particular equine activity.  It is the duty of each participant to act within the limits of the participant's own ability, to maintain reasonable control of the particular equine at all times while participating in an equine activity, to heed all warnings and to refrain from acting in a manner that may cause or contribute to the injury of any person or damage to property.

  2. EXCEPTIONS; PARTICIPANTS. Nothing in subsection 1 prevents or limits the liability of an equine activity sponsor, an equine professional or any other person engaged in an equine activity, if the equine activity sponsor, equine professional or person:

   A.  Provided the equipment or tack, and knew or should have known that the equipment or tack was faulty, and the equipment or tack was faulty to the extent that it did cause the injury;

   B.  [knows of a dangerous latent condition of land that causes injury];

   C.  [recklessly disregards the safety of others thereby causing injury]; or

   D.  [intentionally injures another].

  3. ASSUMPTION OF RISK.  In a personal injury action against an equine professional, a defense or immunity described in subsection 1 may be asserted only if the person injured in the course of an equine activity:

   A.  Had actual knowledge of the inherent risks of equine activities;

   B.  Had professed to have sufficient knowledge or experience to be on notice of the inherent risks; or

   C.  Had been notified of the inherent risks and the limitations of

11

> liability.

For the purposes of this subsection, notice of the inherent risks of equine activity may be satisfied either by a statement signed by the person injured or by a sign or signs prominently displayed at the place where the equine activity was initiated. The statement or sign must contain at least the following information.

> "WARNING

Under Maine law, an equine professional has limited liability for an injury or death resulting from the inherent risks of equine activities."

. . . .

7 M.R.S. § 4103-A.  In addition to Section 4103-A, the Statute includes a definitions section:

**§ 4101. Definitions**

As used in this chapter, unless the context otherwise indicates, the following terms have the following meanings.

. . . .

4. EQUINE.  "Equine" means a horse, pony, mule, donkey or hinny.

5. EQUINE ACTIVITY.  "Equine activity" includes but is not limited to the following:

> A.  Riding or driving an equine or riding as a passenger on or in a vehicle powered by an equine;
>
> B.  Equine training, teaching or testing activities;

. . .

> J.  Participating in an equine activity sponsored by an equine activity sponsor;
>
> K.  Participating or assisting a participant in an equine activity at an equine event;

. . .

6. EQUINE ACTIVITY SPONSOR.  "Equine activity sponsor" means an individual, group, club, partnership, corporation or other entity, whether operating for profit or nonprofit, that sponsors, organizes or provides the facilities for an equine activity. . . and operators, instructors and promoters of equine facilities at

which equine activities are held . . . .

   6-A.  EQUINE EVENT.  "Equine event" means an event in which an equine activity occurs, including, but not limited to . . . recreational riding . . . .

   7.  EQUINE PROFESSIONAL.  "Equine professional" means a person engaged for compensation:

   A.  In instructing a participant or renting to a participant an equine for the purpose of riding, driving or being a passenger on the equine;

   . . . .

   7-A.  INHERENT RISKS OF EQUINE ACTIVITIES.  "Inherent risks of equine activities" means those dangers and conditions that are an integral part of equine activities, including, but not limited to:

   A.  The propensity of an equine to behave in ways that may result in damages to property or injury, harm or death to persons on or around the equine.  Such equine behavior includes, but is not limited to, bucking, shying, kicking, running, biting, stumbling, rearing, falling and stepping on;

   B.  The unpredictability of an equine's reaction to such things as sounds, sudden movements and unfamiliar objects, persons or other animals;

   C.  Certain hazards such as surface and subsurface conditions;

   D.  Collisions with other equines or objects; and

   E.  Unpredictable or erratic actions by others relating to equine behavior.

   8.  PARTICIPANT.  "Participant" means a person, whether amateur or professional, who directly engages in an equine activity, whether or not a fee is paid to participate in the equine activity.

   . . . .

Id. § 4101.

Camp Laurel maintains that it is clear that the statute precludes Samantha's claim. (Mot. for Summary J. at 8.) It observes that there can be no dispute over Samantha's participation in an equine activity sponsored by Camp Laurel. (Id.) Camp Laurel further contends that no exception applies under Section 4103-A(2) and that Samantha had actual knowledge of the inherent risk of the activity and was provided sufficient notice of the inherent risk through the enrollment form signed by her mother. (Id. at 8-9.) Camp Laurel has collected a handful of cases from other jurisdictions applying other statutes in diverse situations to deny a trial.

In opposition, Plaintiff discusses the legal concept of assumption of the risk and argues that Samantha did not assume the risk of injury arising from instructor negligence. (Pl.'s Response at 3-4, Doc. No. 30.) Plaintiff characterizes the Equine Activities Statute as imposing "contractual assumption of the risk," which does not preclude a claim for another's negligence. (Id. at 5.) Plaintiff collects and discusses additional cases, as well as those relied on by Camp Laurel, and argues that there is a genuine issue as to the existence of a trial-worthy negligence claim on this record. (Id. at 5-15.) More particularly, Plaintiff argues that a genuine issue exists with regard to the statutory exception for faulty tack. With respect to faulty tack, emphasis is placed on the alleged failure of Ms. Balmer to fully secure the saddle by tightening the girth after Samantha mounted Tinkerbell, the idea that Tinkerbell was an inappropriate pony that could not be safely saddled because she was so fat and had low withers, and the use of fleece-lined girths under such circumstances. (Id. at 16-17.)

Like the parties, I have been unable to locate any Maine decisional law related to this Statute. The closest that appear to exist, though they are not particularly helpful, are a Maine Superior Court decision addressing a claim under an earlier version of the statute repealed in 1999, Gerrish v. Cool, No. CV-94-102, 1995 Me. Super. Lexis 101 (Me. Sup. Ct. Mar. 14,

1995), and my own memorandum of decision on summary judgment in <u>Emery v. Wildwood Management</u>, 230 F. Supp. 2d 116 (D. Me. 2002), which also involved the predecessor statute. These cases simply reflect that the earlier statutory language was designed to exempt equine activities and horse owners from strict liability for injuries arising from equine activities and to impose a negligence standard. Neither party has discussed any potentially salient legislative history or suggested that the 1999 restructuring of the statute was meant to repudiate any possibility of a simple negligence action arising in the context of equine activities. Given this silence, I desist from extrapolating any such legislative intent. Moreover, the language of the Statute appears by Law Court standards to be plain and unambiguous, so "there is no need to resort to any other rules of statutory construction" other than the plain meaning rule. <u>Compare</u> <u>Merrill v. Sugarloaf Mountain Corporation</u>, 2000 ME 16, ¶ 11, 745 A.2d 378, 384 (describing the language of a somewhat similar ski liability statute as plain and unambiguous).

For present purposes, the most significant Law Court opinion is <u>Merrill</u>, in which the Law Court construed an assumption of the risk provision in a now repealed statute addressed to the liability of ski area operators, 26 M.R.S. § 488 (1988), replaced by 32 M.R.S. § 15217 (Supp. 1996).[3] The statute considered in <u>Merrill</u> provided, in relevant part:

> [E]ach skier who participates in the sport of skiing shall be deemed to have assumed the risk of the dangers inherent in the sport and assumed the legal responsibility for any injury to his person or property arising out of his participation in the sport of skiing, unless the injury or death was actually caused

---

[3] Judge Carter granted a motion for summary judgment in the ski operator context, pursuant to 32 M.R.S. § 15217, which generally parallels the construction of the current Equine Activities Statute, in <u>Green v. Sunday River Skiway Corporation</u>, 81 F. Supp. 2d 122 (D. Me. 1999). In <u>Green</u>, the plaintiff collided with a snow-making hydrant while skiing. The appropriateness of summary judgment in that case was clear because the statute specifies that a collision with snow-making equipment is an inherent risk of skiing. Judge Carter also addressed an assumption of the risk defense under 32 M.R.S. § 15217 in <u>Bresnahan v. Bowen</u>, 263 F. Supp. 2d 131 (D. Me. 2003) (denying motion for summary judgment), but that case involved a claim against another skier rather than a claim against the operator of the ski mountain. The Law Court affirmed an award of summary judgment for a defendant in another case under 32 M.R.S. § 15217, but that case, <u>Maddocks v. Whitcomb</u>, 2006 ME 47, 896 A.2d 265, did not involve any facts that could arguably demonstrate negligence on the part of the operator.

15

>by the negligent operation or maintenance of the ski area by the ski area operator, its agent or employees.

Merrill, 2000 ME 16, 745 A.2d at 381 n.1. Merrill involved a claim that Sugarloaf Mountain Corporation had failed to adequately mark a hazard on a ski trail. The Law Court held that it was error to determine, as a matter of law, that such a hazard was inherent in the sport and that the issue was one for the finder of fact to determine, with the plaintiff bearing the burden of proof on questions of negligence and the defendant bearing the burden of proof on the "affirmative defense" of inherent risk. Id., ¶¶ 6-13, 745 A.2d at 382-84. In the course of rendering its decision, the Law Court considered how the statute's assumption of the risk language should be characterized, either as primary or secondary assumption of the risk. Id., ¶¶ 9-10, 745 A.2d at 383. The gist of that decision is that, under Maine law, even primary assumption of the risk is an affirmative defense with the burden of proof falling on the defendant, to the extent the doctrine persists in Maine law. Id., ¶ 9 (rejecting the contention that the plaintiff must "overcome[] the burden of proof that his or her injuries were not proximately caused by dangers inherent in the sport of skiing" in order to resist what the movant characterized as an otherwise "absolute defense"). The Law Court compared the Maine statute to a Vermont statute that the Vermont Supreme Court had construed more vigorously in favor of defendants, noting that the Vermont statute stated that an individual "who takes part in any sport accepts as a matter of law the dangers that inhere therein insofar as they are obvious," without qualifying the defense with language excepting negligence claims. Id., ¶¶ 10-11, 745 A.2d at 383-84.

The current Equine Activities Statute is not a fundamentally different statute from the statute addressed in Merrill, at least not with respect to the kind of claim advanced by Plaintiff herein. Like the ski operator statute addressed in Merrill, the Equine Activities Statute provides

16

that the participant assumes the risk of injury resulting from the inherent risks of equine activities, 7 M.R.S. § 4103-A(1), but then proceeds to exclude from the definition of inherent risk certain sponsor conduct, most materially conduct related to the provision of "faulty" tack that causes an injury. Id. § 4103-A(2)(A). In addition, the Statute plainly states that assumption of the risk is a defense to be asserted by the sponsor of equine activities, and then only if certain prerequisites are satisfied.[4] Id. § 4103-A(3). Moreover, the Equine Activities Statute defines inherent risk with examples that, though not exclusive, all pertain to the unpredictable nature of equine behavior, the unpredictable conduct of other individuals, and certain natural hazards, rather than the more predictable behavior of sponsors or instructors (such as decisions related to tack, which are elsewhere excluded). Id. § 4101(7-A). Because the summary judgment record raises a genuine issue concerning a "faulty" tack decision, the statute does not preclude Plaintiff's claim as a matter of law.[5]

## CONCLUSION

For reasons set forth above, I RECOMMEND that the Court DENY Defendant's Motion for Summary Judgment (Doc. No. 26).

---

[4] Camp Laurel has offered a statement concerning the notice of risk language found on its enrollment form, but Plaintiff has not sought a summary judgment disposition that would prevent Camp Laurel from asserting the statutory affirmative defense based on the language of Section 4103-A(3). Consequently, I do not offer a recommendation on that issue. Camp Laurel has also offered a statement suggesting that Samantha was familiar with saddling horses, but the record does not appear adequate to determine whether Samantha appreciated the risk of tacking a particularly fat pony with low withers. In any event, the Court need not decide whether Section 4103-A(3)(A) or (C) applies here. Assuming that the defense is available to Camp Laurel (it would be an issue of fact, in any event), there remains a factual question apropos the faulty tack versus inherent risk dispute.

[5] The persuasive authorities cited by the parties all strike me as reasonable decisions, including Camp Laurel's primary authority, Cooperman v. David, 214 F.3d 1162 (10th Cir. 2000), in which the Tenth Circuit Court of Appeals affirmed a ruling that a slipping saddle is a risk inherent in horseback riding where the burden under Wyoming law was placed on the plaintiff to disprove inherent risk and the claim was merely premised on the very general factual scenario of a saddle slipping well into the course of a day-long horseback riding excursion. Ultimately, my recommendation is based not on any of these persuasive authorities, but on the language of Maine's Equine Activities Statute, the specific scenario presented in this case, and the guidance supplied by the Law Court in Merrill with respect to the assignment of burdens of proof.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

March 1, 2010