UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| SAMANTHA ZUCKERMAN, a minor, by her parent and natural guardian ROBERTA ZUCKERMAN, )<br>)<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>COASTAL CAMPS, INC. d/b/a CAMP )<br>LAUREL, )<br>)<br>Defendant. ) | CV-08-335-B-W |

**ORDER AFFIRMING THE RECOMMENDED DECISION
OF THE MAGISTRATE JUDGE**

On July 30, 2006, during a horseback riding lesson at Camp Laurel in Mount Vernon, Maine, twelve-year old Samantha Zuckerman sustained injuries when she fell from Tinkerbell, the pony she was riding. Claiming negligence, Samantha, through her mother, Roberta Zuckerman, sued Coastal Camps, Inc., doing business as Camp Laurel, seeking damages for personal injuries. Samantha alleges that her instructors improperly saddled Tinkerbell and as a result, her saddle slipped causing her to fall. Camp Laurel moved for summary judgment. *Def.'s Motion for Summary J.* (Docket # 26) (*Def.'s Mot.*). On March 1, 2010, the United States Magistrate Judge filed her Recommended Decision on Camp Laurel's motion recommending that the Court deny Camp Laurel's motion. *Recommended Decision on Motion for Summary Judgment* (Docket # 38) (*Rec. Dec.*). Camp Laurel objected and Samantha responded. *Def.'s Obj. to Report of Recommendation* (Docket # 39) (*Def.'s Obj.*); *Pl.'s Resp. to Def.'s Obj. to the Report and Rec. Dec. on Def.'s Mot. for Summary J. with Incorporated Mem. of Law* (Docket # 40) (*Pl.'s Resp.*). After review and consideration of the Recommended Decision, together with

the entire record, the Court has made a de novo determination of all matters adjudicated by the Magistrate Judge. For the reasons in the Recommended Decision and in this affirmance, the Court affirms the Recommended Decision and denies Camp Laurel's Motion for Summary Judgment.

I.  STATEMENT OF FACTS

At the time of the July 30, 2006, accident, Samantha was learning to canter and Sarah Balmer, one of Camp Laurel's riding instructors, was leading Tinkerbell around an enclosed ring on a lunge line. *Def.'s Statement of Material Facts* ¶¶ 14, 15 (Docket # 26) (*Def.'s SMF*). Pamela Payson, the head of Camp Laurel's equestrian program, was present and saw Samantha fall. *Id.* ¶ 15.

Throughout the summer and at the time of the accident, Camp Laurel used fleece-lined girths on Tinkerbell and the other horses. *Pl.'s Statement of Additional Material Facts* ¶ 5 (Docket # 33) (*Pl.'s SAMF*). The parties provided competing expert opinions on whether saddles with fleece-lined girths are more prone to slip. *Pl.'s SAMF* ¶ 6; *Pl.'s Response to Def.'s Mot. for Summary J.* at 12-13 (Docket # 30) (*Pl.'s Resp. to Def.'s Mot.*); *Reply Mem. of Law in Support of Def.'s Mot. for Summary J.* at 6 (Docket # 36) (*Def.'s Reply in Support of Def.'s Mot.*).

The parties also dispute whether Camp Laurel followed proper protocol when saddling Tinkerbell on July 30, 2006. Ms. Payson testified that after the saddle is on a horse, "you put the girth on snug enough so your saddle is not going to shift, but not - - you don't tighten it up all the way." *Pl.'s SAMF* ¶ 18. The horse is led from the stables to the instruction ring. Before the rider mounts the horse, the girth is fully tightened. *Id.* ¶ 19. Ms. Payson stated that after the rider mounts the horse, the instructor checks the girth a third time "because sometimes depending on what you have for pads on the horse or whatever, [if you] have a horse [with] a

thick natural fleece. When you sit down on all that fleece, sometimes you end up with a little play, so you always check that." *Id.* ¶ 20. Ms. Balmer testified that she "did not always tighten the girth after the rider had mounted the horse." *Id.* ¶ 25. Instead, she "would just like touch the girth, slip my hand under to see or touch, put a finger underneath just to triple check if she was walking by." *Id.* Ms. Balmer does not specifically remember checking Tinkerbell's girth after Samantha mounted the pony on July 30, 2006. *Def.'s Reply Statement of Material Facts* ¶ 23 (Docket # 37) (*Def.'s Reply SMF*). Samantha testified that "as a general matter, in 2006, she only recalls the Camp Laurel riding instructors checking the girth twice before the horse or pony was mounted." *Pl.'s SAMF* ¶ 27.

Tinkerbell was equipped with a crupper[1] to keep the saddle from sliding forward. Ms. Payson used a crupper with Tinkerbell because Tinkerbell was a round pony and "had low withers, [and] she just wanted her saddle not to ride forward at all." *Id.* ¶¶ 10, 12.

Samantha described her fall from Tinkerbell:

> I was cantering in a circle on a lead rope . . . and I started to feel the saddle slide towards the left, and I lost my balance; and my foot somehow . . . got caught in the stirrup, but when I hit the ground I – I mean, my foot came out from the stirrup, and I hit my head while falling.

*Id.* ¶ 34. Samantha testified that she "looked up" and "saw the saddle, not on top of the horse. . . . It was either kind of on the side or underneath." *Id.* ¶ 38. She stated that it was not possible that she "imagined" seeing the saddle upside down. *Id.* "I believe what I saw because I saw it upside down." *Id.*

Samantha's recollection is contradicted by Ms. Payson and Ms. Balmer; each testified that Samantha fell off Tinkerbell because she lost her balance. *Id.* ¶¶ 39-41; *Def.'s SMF* ¶ 18. Ms. Payson testified that "although she does not remember the saddle sliding off to the side of

---

[1] A crupper is a leather strap looped under a horse's tail and attached to a saddle to keep the saddle from slipping forward. It is usually used on horses with low withers. *Pl.'s SAMF* ¶ 8-9.

the pony, she 'would not say that it was impossible the saddle shifted slightly . . . because all of the rider's weight would have gone one direction.'" *Pl.'s SAMF* ¶ 42. Ms. Balmer testified that the saddle did not slip because "if it had slipped very far, I would have definitely noticed because the horse's head would have been sideways."[2] *Id.* ¶ 47.

In her Complaint, Samantha alleges that "[d]uring [her] riding lesson, Tinkerbell's saddle slipped, causing [her] to fall from the horse." *First Amend. Compl. and Demand for Jury Trial* ¶ 15 (Docket # 16) (*Amend. Compl.*) "Following the accident, Tinkerbell's saddle was observed to have slipped from its proper position on top of the horse." *Id*. ¶ 16. She alleges that Camp Laurel breached its duty of care to Samantha "by failing to ensure that Tinkerbell was properly saddled for [Samantha's] riding lesson and by otherwise failing to ensure that its riding program was conducted in a manner that reasonably ensure [Samantha's] safety." *Id*. ¶ 20.

Camp Laurel moved for summary judgment on the ground that it is immune from liability under Maine Equine Activities Act (Act), 7 M.R.S.A. § 4101 et seq., because a slipping saddle is a risk inherent to the sport of horseback riding. *Def.'s Mot*. at 9-11. Alternatively, it argued that Samantha's speculative testimony about the fall is insufficient to generate a genuine issue of material fact. *Def.'s Mot*. at 11-13. In her recommendation, Magistrate Judge Kravchuk determined that there is factual question as to whether one of the statutory exceptions to immunity applies; more specifically, whether Samantha's riding instructors made a "'faulty' tack decision." *Rec. Dec*. at 17. Based on this exception, "the specific scenario presented in this case, and the guidance supplied by the Law Court in [*Merrill v. Sugarloaf Mountain Corporation*, 2000 ME 16, 745 A.2d 378] with respect to the assignment of burdens of proof"

---

[2] On July 30, 2006, Tinkerbell was also wearing a grazing check, a piece of tack that prevents a horse from pulling its head forward to eat. *Def.'s SMF* ¶ 25. If the saddle slipped it would have pulled on the grazing check causing the pony to turn its head. *Id*.; *Pl.'s SAMF* ¶ 47. Ms. Balmer testified that she did not know the exact distance a saddle could slip before the grazing check would pull on the pony's head, but that it could be "four inches maybe, five inches, six inches." *Def.'s Reply SMF* ¶ 47.

the Magistrate Judge recommended that the Court deny Camp Laurel's Motion for Summary Judgment. *Rec. Dec*. at 17 n.5.

Camp Laurel objects to the Magistrate Judge's recommended decision on two grounds. It argues that the Magistrate Judge erred in finding that Camp Laurel bears the burden of proof under the Act and in finding a genuine issue of material fact with respect to the "faulty" tack exception. *Def.'s Obj*. at 5-9. In addition, Camp Laurel argues that the Magistrate Judge should have stricken the statement of facts which include the opinion of Ida Anderson, Samantha's expert, and erred by relying on Ms. Anderson's speculative statements. *Def.'s Obj*. at 1-5.

## II. DISCUSSION

### A. Ms. Anderson's Statements

Camp Laurel sought to strike three statements of material facts reflecting the expert opinions of Ida Anderson:

> 6. These fuzzy girths, although comfortable for the animals, are more prone to slippage. The fleece-lined girth Tinkerbell was wearing on July 30, 2006, ***may*** have allowed the saddle to slip from its proper position. *Declaration of Ida Anderson* ("Anderson Dec"), ¶ 9.
> 14. Given the fact that due to Tinkerbell's build, the Camp had experienced difficulty in keeping Tinkerbell's saddle from slipping forward throughout the summer of 2006, ***it is possible*** that on July 30, 2006, the saddle slipped out of position as a result of Tinkerbell's round belly and/or her low withers, notwithstanding the presence of the crupper. *Anderson Dec*. at ¶ 11.
> 15. ***If*** Tinkerbell's saddle did slip forward it would no longer be secure, as the saddle would no longer cup the withers which hold it in place. Once a saddle slips forward and it no longer cups the withers, it is ***nearly*** inevitable that it will slip sideways. Any lack of saddle stability ***may*** cause a rider to fall from a horse or pony. *Anderson Dec*. at ¶ 11.

*See Def.'s Obj.* at 1 n.1 (quoting *Pl.'s SAMF* ¶¶ 6, 14, 15) (emphasis added by Defendant). Camp Laurel contends these statements are "speculative and wholly without evidentiary support," and are "not a statement of fact, but rather speculation and conjecture." *Def.'s Reply SMF* ¶¶ 6, 14, 15. Samantha did not respond to these objections. Although the Magistrate Judge did not

5

specifically deny Camp Laurel's motion to strike, she explained that Ms. Anderson's statements in paragraph six were "an expert explanation of one contributing factor that would support a finding that the saddle did, in fact, slip as Samantha testified it did. I treat this as a material factual statement and consider it as fair testimony that may be considered on behalf of a summary judgment non-movant who is entitled to have the record reviewed in the light most favorable to her case." *Rec. Dec.* at 6. The Magistrate Judge found the objections to paragraph 14 and 15 to be similar and that "for purposes of summary judgment, Samantha, as non-movant, is entitled to the benefit of this expert testimony." *Id.* at 7. The Magistrate Judge noted that "Ms. Anderson's qualifications to serve as an expert witness have not been challenged. Nor has her testimony been challenged as unreliable pursuant to Federal Rule of Evidence 702." *Id.* at 6 n.2. She characterized Mr. Anderson's testimony as "garden-variety expert testimony." *Id.* at 7.

In its objection, Camp Laurel argues that Samantha cannot "create a genuine issue of material fact based on three unsupported assumptions bootstrapped into an 'it is possible' hypothesis set forth by Ms. Anderson." *Def.'s Obj.* at 3. "[T]he requisite proof of a causal link between Camp Laurel's alleged negligence and plaintiff's injuries cannot be established with inherently speculative opinion testimony." *Id.* at 4.

Samantha responds that Ms. Anderson is "an expert witness whose qualifications have not been challenged." *Pl.'s Resp.* at 2. She "did exactly what experts are supposed to do – she reviewed the available facts and offered expert opinion testimony regarding the likely causes of Samantha's fall. . . . Federal Rule of Evidence 702 expressly permits exactly this sort of opinion testimony from a qualified expert witness." *Id.* at 2.

The Court overrules Camp Laurel's objection. Ms. Anderson was not present at the scene of the accident, and is not in a position to say precisely what happened. Her opinion is

necessarily dependent upon the Plaintiff's ability to prove at trial the facts upon which her opinion depends. Whether Samantha is able to establish at trial the foundational prerequisite for her testimony remains to be seen, but for summary judgment purposes, she has generated sufficient evidence to permit Ms. Anderson to offer an expert explanation. Her testimony may be helpful to the factfinder to explain the event from the perspective of an acknowledged horse riding expert. *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) (describing the Rule 702 test to be whether "the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue").

When the "adequacy of the foundation for the expert testimony is at issue, the law favors vigorous cross-examination over exclusion." *Carmichael v. Verso Paper, LLC*, 679 F. Supp. 2d 109, 119 (D. Me. 2010). "If the factual underpinnings of [the expert's] opinions [are] in fact weak, that [is] a matter affecting the weight and credibility of their testimony." *Payton v. Abbott Labs*, 780 F.2d 147, 156 (1st Cir. 1985); *Brown v. Wal-Mart Stores, Inc.*, 402 F. Supp. 2d 303, 308 (D. Me. 2005) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. It is only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury [that] such testimony [must] be excluded on foundational grounds.") (citations and internal quotation marks omitted)). Furthermore, "absolute certainty is not a prerequisite to admissibility of an expert's testimony." *Small v. GMC*, 2006 U.S. Dist. LEXIS 83717, at *33 (D. Me. Nov. 15, 2006); *see Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (stating that while expert opinions "must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation, . . . absolute certainty is not required") (citation omitted)).

Camp Laurel's real objection appears to be to the way Ms. Anderson expressed her opinions. *Def.'s Obj.* at 2-5 (emphasizing that Ms. Anderson qualified her opinion by using terms such as "may" or "it is possible"). Although an expert is not entitled to guess or speculate, there is no "threshold level of certainty required of an expert before his opinion may be admitted in evidence." *State v. Woodbury*, 403 A.2d 1166, 1171 (Me. 1979); Richard H. Field & Peter L. Murray, Maine Evidence § 702.2 (2000 ed.). In the words of the First Circuit, "Rule 401 merely requires that evidence make a contested fact more likely than it would be without the evidence (not 'more likely than not')." *Baker v. Dalkon Shield Claimants Trust*, 156 F.3d 248, 253 (1st Cir. 1998). Thus, the Maine Supreme Judicial Court has held that the fact an expert in a criminal case testified that "the accident 'might' be or 'probably' was the cause of the injury, is merely a circumstance to be taken into consideration by the trier of facts." *Woodbury*, 403 A.2d at 1170 (citation omitted); *Clifford v. United States*, 532 A.2d 628, 639-40 (D.C. Ct. App. 1987) (stating that "[a] rule of admissibility demanding a greater level of self-proclaimed certainty on the witness' part would remove from the jury its role in weighing the evidence").

As a qualified equine expert familiar with fleece-lined girths and saddle cinching, Ms. Anderson's opinion goes beyond the type of speculation prohibited at the summary judgment stage. *Small* at *33-34 (citing *United States v. Monteiro*, 407 F. Supp.2d 351, 372 (D. Mass. 2006) (stating "[t]he lack of absolute certainty on the part of the expert does not render her opinion unreliable under *Daubert*)).

**B.     Maine Equine Activities Statute**

Camp Laurel disputes two of the Magistrate Judge's conclusions with respect to the Maine Equine Activities Act: the first concerns the burden of proof; the second the applicability of an exception to the Act.

### 1. **Burden of Proof**

As the Magistrate Judge noted, no Maine decision discusses the Maine Equine Activities Act in its current form, and the case law that does exist discusses the earlier version of the act in a limited manner. *Rec. Dec*. at 14-15 (citing *Gerrish v. Cool*, Civil Action Docket No. CV-94-102, 1995 Me. Super. LEXIS 101 (Me. Sup. Ct. Mar. 14, 1995) (concluding that the Act does not impose strict liability) and *Emery v. Wildwood Mgmt.*, 230 F. Supp. 2d 116 (D. Me. 2002) (imposing a negligence standard)). There does not appear to be any legislative history to suggest that the current version of the Maine Equine Activities Act which was amended in 1999 "was meant to repudiate any possibility of a simple negligence action arising in the context of equine activities." *Rec. Dec*. at 15.

Absent relevant case law and legislative history, the Magistrate Judge turned to a similarly structured statute, Maine's Ski Liability Statute, 26 M.R.S.A. § 488 (1988) which was replaced by 32 M.R.S.A. § 15217 (Supp. 1996),[3] and *Merrill v. Sugarloaf Mountain Corporation*, 2000 ME 16, 745 A.2d 378, a Law Court decision interpreting the earlier vision of the ski liability statute. Reviewing *Merrill*, the Magistrate Judge noted that the Law Court determined that whether a hazard on a ski trail was an risk inherent to the sport of skiing was an issue "for the finder of fact to determine, with the plaintiff bearing the burden of proof on questions of negligence and the defendant bearing the burden of proof on the 'affirmative defense' of inherent risk." *Rec. Dec*. at 16 (citing *Merrill*, ¶¶ 6-13, 745 A.2d at 382-84). The Magistrate Judge observed that "[l]ike the ski operator statute addressed in *Merrill*, the Equine Activities Statute provides that the participant assumes the risk of injury resulting from the inherent risks of equine activities, 7 M.R.S. § 4103-A(1), but then proceeds to exclude from the

---
[3] The Magistrate Judge states that 32 M.R.S.A. § 15217 "generally parallels the construction of the current Equine Activities Statute." *Rec. Dec*. at 15 n.3. The Court agrees.

9

definition of inherent risk certain sponsor conduct, most materially conduct related to the provision of 'faulty' tack that causes an injury." *Rec. Dec*. at 17. The Magistrate Judge concluded that "the Statute plainly states that assumption of the risk is a defense to be asserted by the sponsor of equine activities, and then only if certain prerequisites are satisfied." *Rec. Dec*. at 17.

Camp Laurel argues that the Magistrate Judge erred by placing the burden on Camp Laurel to "show that the plaintiff's alleged injuries resulted from an 'inherent risk of equine activities'" and by concluding that "whether or not Camp Laurel carries this burden is an issue of fact for the jury." *Def.'s Obj*. at 5. The Court agrees with the Magistrate Judge. Assumption of risk is an affirmative defense and generally the party raising an affirmative defense has the burden of proof on the defense. *Merrill*, ¶ 12, 745 A.2d at 384; *Hansen v. Sunday River Skiway Corp.*, 1999 ME 45, ¶ 11, n.2, 736 A.2d 220, 223 (stating that "the party opposing a claim, usually a defendant, has the burden of proof on an issue characterized as an affirmative defense or other issues to avoid or reduce liability. *See e.g., Lovely v. Allstate Ins. Co.*, 658 A.2d 1091, 1094 (Me. 1995) (Lipez, J., concurring) (damage reduction); *Minott v. F.W. Cunningham & Sons*, 413 A.2d 1325, 1331 (Me. 1980) (comparative fault); *Isaacson v. Husson College*, 297 A.2d 98, 106-07 (Me. 1972) (comparative fault); *Corbett v. Curtis*, 225 A.2d 402, 409 (Me. 1967) (assumption of the risk)"). The Magistrate Judge did not err by assigning Camp Laurel the burden of proof on its assumption of risk defense.

Camp Laurel also argues that it was wrong for the Magistrate Judge to compare Maine's Equine Activities Act to the repealed Maine skiing statute because the two are "markedly dissimilar." *Def.'s Obj*. at 5. In particular, former 26 M.R.S.A. § 488 unequivocally provides that the statute "shall not prevent the maintenance of an action against a ski area operator for the

negligent design, construction, operation or maintenance of a tramway." *Merrill*, 2000 ME 16, ¶ 1, n.1, 745 A.2d at 381 (citing 26 M.R.S.A. § 488). Camp Laurel's concern is that "the Magistrate [Judge]'s reading of the Equine Act completely eviscerates its protections: any plaintiff could avoid its application simply by adding the word 'negligence' to her complaint." *Def.'s Obj*. at 7. For example, even though the Act specifically excludes liability for a horse's "bucking, kicking, shying, and running" because such behavior is inherent to equine activities, Camp Laurel argues that based on the Magistrate Judge's interpretation of the statute, "a defendant could not invoke the protections of the act if the plaintiff simply claimed . . . 'it is possible' that some negligent act by her instructor 'may' have caused the horse to run or kick, and 'may' have caused the plaintiff to fall." *Def.'s Obj*. at 7.

Camp Laurel's examples all concern a sponsor or professional acting negligently and through this negligence causing a horse to act in an inherently risky manner—kicking, running, biting, colliding or bolting. In those examples, the sponsor would likely be immune under the Act. The Act specifies that "[e]ach participant . . . in an equine activity expressly assume the risk and legal responsibility for any . . . damages arising from personal injury . . . that results from the inherent risk of equine activities." 7 M.R.S.A. § 4103-A(1). The Act defines the "inherent risks of equine activities":

> [T]hose dangers and conditions that are an integral part of equine activities, including, but not limited to:
>
> A. The propensity of an equine to behave in ways that may result in damages to property or injury, harm or death to persons on or around the equine. Such equine behavior includes, but is not limited to, bucking, shying, kicking, running, biting, stumbling, rearing, falling and stepping on;
>
> B. The unpredictability of an equine's reaction to such things as sounds, sudden movements and unfamiliar objects, persons or other animals;
>
> C. Certain hazards such as surface and subsurface conditions;

D. Collisions with other equines or objects; and

E. Unpredictable or erratic actions by others relating to equine behavior.

7 M.R.S.A. § 4101(7-A). Even if the actions of the professional could be linked to the horse engaging in an inherently risky activity, such as kicking, the professional could still be immune.[4] Thus, as the Magistrate Judge pointed out, the inherent risks to equine activities listed in the statute "pertain to the unpredictable nature of equine behavior, the unpredictable conduct of other individuals, and certain natural hazards rather than the more predicable behavior of sponsors or instructions (such as decision related to tack, which are excluded elsewhere)." *Rec. Dec*. at 17.

Unlike Camp Laurel's hypothetical situations where negligence contributes to the inherent risk, the negligence in this case is tied to an exception to liability. Although the Act is silent as to simple negligence as an inherent risk, the statute explicitly sets forth several specific exceptions to the liability shield based on negligent actions by the equine professional or organization. Thus, even if the Court were to agree that a slipping saddle is a risk inherent to horseback riding, an equine professional may still be liable if the equine activity sponsor, equine professional or person:

A. Provided the equipment or tack, and knew or should have known that the equipment or tack was faulty, and the equipment or tack was faulty to the extent that it did cause the injury;

B. Owns, leases, rents or otherwise is in lawful possession and control of the land or facilities upon which the participant sustained injuries because of a dangerous latent condition that was known or should have been known to the equine activity sponsor, equine professional or person;

---

[4] This conclusion is supported by additional language in the statute:
> Each participant has the sole responsibility for knowing the range of that person's ability to manage, care for and control a particular equine or perform a particular equine activity. It is the duty of each participant to act within the limits of the participant's own ability, to maintain reasonable control of the particular equine at all times while participating in an equine activity, to heed all warnings and to refrain from acting in an manner that may cause of contribute to the injury of any person or damage to property.

7 M.R.S.A. § 4103-A(1). The described obligations of the participant relate to controlling the horse, not to a faulty tack or equipment.

C. Commits an act or omission that constitutes reckless disregard for the safety of others and that act or omission caused the injury. For the purposes of this section, "reckless" has the same meaning as "recklessly," defined in Title 17-A section 35, subsection 3, paragraph A; or

D. Intentionally injures the participant.

7 M.R.S.A. § 4103-A(2). These exceptions illustrate that the Act does not provide blanket protection to sponsors and professionals from their own culpable acts.

Samantha does not assert that Camp Laurel negligently caused Tinkerbell to behave like a horse; she claims that Camp Laurel should be held responsible under one of the exceptions enumerated by the Act, specifically whether Camp Laurel exposed itself to liability by providing faulty tack or equipment.[5] Camp Laurel's attempt to define Samantha's case as fitting the general rule against liability for risks inherent to equine activities fails because her claim may factually fit within one of the exceptions.[6]

### 2. Faulty Equipment or Tack Exception

Maine's Equine Activities Act does not protect an equine activity sponsor from liability when the equine activity sponsor

> [p]rovided the equipment or tack, or knew or should have known that the equipment or tack was faulty to the extent that it did cause the injury.

7 M.R.S.A § 4103-A(2)(A). The Magistrate Judge noted that the issue of faulty equipment or tack had been raised by Samantha in three ways: "the alleged failure of Ms. Balmer to fully secure the saddle by tightening the girth after Samantha mounted Tinkerbell, the idea that

---

[5] Both parties present case law from other jurisdictions to advance their position. In particular, Camp Laurel cites a Tenth Circuit case, *Cooperman v. David*, 214 F.3d 1162 (10th Cir. 2000), which concluded that a sliding saddle was an inherent risk of horseback riding. A similar conclusion by this Court, however, would not provide absolute immunity to Camp Laurel in this situation because there are issues of material fact as to whether one of statutory exceptions to immunity apply, specifically whether Camp Laurel knew or should have known that the equipment or tack was faulty. Here, the statement of material facts precludes the conclusion that Camp Laurel is immune as a matter of law under the Maine Equine Activities Act because there is a question of material fact surrounding whether a statutory exception to liability applies.

[6] At the same time, Samantha's claim at trial will be restricted to the constraints of the Act.

Tinkerbell was an inappropriate pony that could not be safely saddled because she was so fat and had low withers, and the use of fleece-lined girths under such circumstances." *Rec. Dec*. at 14. The Magistrate Judge concluded that "the summary judgment record raises a genuine issue concerning a 'faulty' tack decision" and therefore "the statute does not preclude Plaintiff's claim as a matter of law." *Id*. at 17.

Camp Laurel argues that there is not a "scintilla of evidence that the tack was indeed 'faulty.'" *Def.'s Obj*. at 8. Specifically, Camp Laurel argues that faulty tack means "riding equipment (saddles, girths, bridles, stirrups, etc.) that had cracked, broke, or frayed." *Id*. Camp Laurel contends that the term "faulty tack" does not include an "improperly tightened girth" or an "inappropriate pony" or "faulty horse." *Def.'s Obj*. at 7, 8. With regard to the fleece-lined girth, Camp Laurel asserts that Samantha's expert acknowledges that "not a single equestrian industry publication argues against using such a girth" and provides its own experts who confirm that fleece-lined girths are "no more prone to slipping that leather girths." *Def.'s Obj*. at 8.

The Act does not define "equipment or tack" that is "faulty" and there is no Maine decision interpreting this exception. It is evident that this provision applies to equipment that is old, worn, dry, damaged, or otherwise defective. *See Day v. Snowmass Stables, Inc.*, 810 F. Supp. 289 (D. Colo. 1993) (broken neck yoke ring); *Easterling v. English Point Riding Sables*, Civil Action No. 93-2050 Section "N", 1994 U.S. Dist. LEXIS 3470 (E.D. La. 1994) (broken martingale). Although Samantha highlights that the saddles used by Camp Laurel were "Ford Escort" quality, she has not alleged that her fall was the result of an old, defective, or low quality saddle. *Def.'s SMF* ¶ 19, *Pl.'s Opp'n to Def.'s Statement of Material Fact* ¶ 19 (Docket # 31) (*Pl.'s Opp'n Def.'s SMF*). Instead she asserts that Tinkerbell was not "properly saddled" and that her fall was "most likely due to Ms. Balmer's negligence in failing to properly tighten the

14

girth on the saddle or to perform the necessary checks to make sure that the saddle was properly secure." *Amend. Compl.* ¶ 20; *Pl.'s SAMF* ¶ 49.

Urging a more expansive definition of faulty tack and equipment, Samantha cites two decisions in which the definition of faulty tack was extended to include the improper installation or positioning of equipment or tack which is otherwise in sound condition. *See Berlangieri v. Running Elk Corporation*, 48 P.3d 70, 78 (N.M. Ct. App. 2002) (holding "the terms 'faulty' and 'faulty condition' to be reasonably susceptible to an interpretation extending them to situations in which the fault consists of applying or positioning the equipment or tack in an unsafe manner"); *Hubner v. Spring Valley Equestrian Center*, 975 A.2d 992, 997 (N.J. Super. Ct. App. Div. 2009) (expressing "no doubt that an owner who knows that training equipment is not properly installed or is inappropriate for the purpose it is used may be found to have knowingly provided equipment that is faulty within the meaning of [the New Jersey Equine Activities Liabilities Act]").

The Court agrees that the word "faulty" is sufficiently ambiguous to include the use of a non-defective, but inappropriate piece of equipment. *See Teles v. Big Rock Stables, L.P.*, 419 F. Supp. 2d 1003, 1009 (E.D. Tenn. 2006) (invoking the faulty tack exception when non-defective stirrups are adjusted to an improper length). The statute does not define "faulty," but the dictionary contains two relevant definitions: "marked by a fault: having a fault, blemish, or defect" and "not fit for the use or result intended." Webster's Third New International Dictionary 829 (2002). Camp Laurel relies on the first definition; Samantha on the second. Absent a suggestion that the Maine Legislature preferred one definition over the other, the Court accepts both. From the Court's perspective, if Ms. Balmer used a girth that was wrong for

Tinkerbell, given her weight and shape, and if fleece-lined girths are more prone to slippage than other types, the girth could fit within the second definition of the term "faulty."

The Court agrees with the Magistrate Judge that the summary judgment record raises a genuine issue of material fact concerning a "faulty" tack decision. The Court denies Camp Laurel's Motion for Summary Judgment.

## III. CONCLUSION

The Court ADOPTS the Magistrate Judge's Recommended Decision (Docket # 38) and DENIES Camp Laurel's Motion for Summary Judgment (Docket # 26).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 4th day of June, 2010